IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CIVIL ACTION |
| | : | |
| DAVID FIORI, JR. | : | No. 12-5128 |
| | : | |
| | : | |
| DAVID FIORI, JR., | : | BANKRUPTCY |
| | : | |
| Appellant, | : | No. 09-10960 |
| | : | |
| v. | : | |
| | : | |
| BONNIE B. FINKEL and PRECISION | : | |
| INTERFACE ELECTRONICS, INC., | : | |
| | : | |
| Appellees. | : | |
| | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **September 30, 2013**

Debtor-Appellant David Fiori, Jr., appeals from a June 6, 2012, Bankruptcy Court Order
(the Sale Order) which authorized the trustee of Fiori's Chapter 7 bankruptcy estate (Chapter 7
Trustee) to sell Fiori's interest in certain intellectual property assets to Appellee Precision
Interface Electronics, Inc. (PIE) free and clear of all liens, claims, interests, and encumbrances
pursuant to 11 U.S.C. § 363.  Fiori also appeals from the Bankruptcy Court's July 3, 2012, Order
denying reconsideration of the June 6 Sale Order.  PIE has filed a motion to dismiss Fiori's
appeal as statutorily moot pursuant to 11 U.S.C. § 363(m).  For the reasons set forth below, PIE's
motion to dismiss will be granted.

## FACTS

PIE is a private company that manufactures and distributes consumer electronic
equipment for use in automobiles.  Beginning in 1997, PIE contracted with Fiori, an electrical
engineer, through his sole proprietorship, Integrated Electronic Technologies, Inc., to provide

research and development in support of PIE's products in exchange for royalties and other payments. Over time, the business relationship between Fiori and PIE soured, and in 2008, Fiori commenced arbitration proceedings against PIE, asserting claims arising out of PIE's alleged breach of the parties' agreement, including a claim for patent infringement. PIE asserted several counterclaims against Fiori in the arbitration. On February 2, 2009, the arbitrator issued a $614,276.50 award in favor of PIE.[1]

Less than two weeks later, on February 12, 2009, Fiori filed a Chapter 11 bankruptcy petition. In March 2009, Fiori filed a schedule of his personal property in support of his bankruptcy petition, which he amended the following month. In the portion of the schedule pertaining to intellectual property, Fiori listed seven patents, two patent applications, and two copyright infringement items, indicating the current value of these items as either "Unknown" or "0.00." Supplemental R., Tab 6. He did not schedule certain other intellectual property he owned. In January 2010, Fiori's bankruptcy was converted to a Chapter 7 case. Following the conversion, in March and May 2010, a meeting of creditors pursuant to 11 U.S.C. § 341 (341 meeting) was held in the Chapter 7 case, at which Fiori testified, consistent with the information

---

[1] The arbitration award (1) denied Fiori's claims for breach of contract, quantum meruit, fraud, breach of duty of good faith and fair dealing, injunctive relief, and patent infringement; (2) denied PIE's claim for reimbursement of certain overhead contributions and royalty payments erroneously paid; (3) awarded PIE $614,276.50, consisting of $448,091.50 in royalties advanced over and above the royalties due and owing, and $166,185 in damages from Fiori's failure to meet delivery promises, plus interest; (4) ordered Fiori to return certain equipment PIE had provided to him; (5) declared PIE to be a joint owner of all products developed pursuant to the parties' agreement, with certain specified exceptions, and declared PIE possessed an exclusive license to manufacture and market the jointly owned products until PIE ceased manufacturing and eliminated its finished goods inventory of such products, subject to PIE's obligation to pay Fiori royalties on such sales; and (6) ordered Fiori to reimburse PIE for a portion of the administrative fees and expenses associated with the arbitration.

in his schedule, that his intellectual property had either no value or unknown value.[2]

PIE is a creditor of Fiori's bankruptcy estate as a result of the arbitration award. In May 2010, PIE filed an adversary action against Fiori in the Bankruptcy Court, seeking a determination that Fiori's debt to PIE was non-dischargeable because it was "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud," or "for willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(2)(A), (a)(6).

PIE and Fiori settled the adversary action on the eve of trial. On July 18, 2011, the day before the trial was scheduled to begin, PIE advised the Bankruptcy Court the parties had reached a settlement in principle and requested a continuance of the trial pending completion of the settlement. The following day, the parties appeared before the Bankruptcy Court and confirmed they had agreed to settle the adversary action based on a payment to PIE from a third party and Fiori's transfer to PIE of certain intellectual property rights, i.e., his rights in intellectual property his bankruptcy estate might abandon to him at some later date. R., Tab 48 at 4-5. PIE also represented it was in discussions with the Chapter 7 Trustee to resolve PIE's claim against the estate pursuant to an arrangement whereby PIE would acquire certain of Fiori's intellectual property owned by the estate in exchange for a payment from PIE. *Id.* at 5-6. After the hearing, the Bankruptcy Court marked the matter as settled, with a stipulation to be filed within 30 days.

On August 9, 2011, Fiori and PIE executed a "Full and Final Mutual Release and Settlement Agreement" (Settlement Agreement), the proper interpretation of which is at the heart of Fiori's appeal. Under the terms of the Settlement Agreement, the parties released all claims

---

[2] Although the transcript of the 341 meeting is not in the record, counsel for the Trustee and for PIE testified that Fiori indicated at the meeting his intellectual property had no value. Hr'g Tr. 46, June 6, 2012.

against each other with the sole exception of PIE's claim against Fiori's bankruptcy estate for the transfer of intellectual property from the estate to PIE. In consideration for the mutual release, (1) PIE agreed to dismiss the adversary action with prejudice, (2) Fiori agreed to "ensure payment to PIE for the sum of $100,000," upon dismissal of the adversary action, and (3) Fiori also agreed, upon dismissal of the adversary action,

> [to] assign[], transfer[], quitclaim[], and convey to PIE all of Fiori's intellectual property rights, if any, including but not limited to all copyright interests and all patent licensing rights, to the software, processes, methodologies, circuitry and designs used in all of the products joint developed pursuant to the agreement and its amendments.
> Substantially all of those products are listed in Schedule A
> ("the Products") subject however to the approval and or consent of the bankruptcy court and or the trustee in the bankruptcy as may be required ("Bankruptcy Court Approval").

R., Tab 46. The parties further agreed

> It shall be PIE's responsibility to obtain such Bankruptcy Court Approval and Fiori shall cooperate to the extent requested by PIE to obtain such Bankruptcy Court Approval but the failure to obtain such Bankruptcy Court Approval shall not in any way effect the validity of the release set forth in paragraph 2 above or the dismissal of the Adversarial Litigation contemplated herein.

*Id.* The parties submitted the Settlement Agreement to the Bankruptcy Court as part of a stipulation and order dismissing the adversary action on August 18, 2011, and the Bankruptcy Court approved the stipulation on August 23, 2011. R., Tab 47.

Two months later, on October 26, 2011, PIE and the Chapter 7 Trustee entered into an "Asset Purchase and Sale Agreement" (Sale Agreement), in which PIE agreed to purchase "all right, title and interest" in certain intellectual property rights of Fiori's bankruptcy estate for a payment of $7,500 and the release of its claim in the bankruptcy.[3] Specifically, PIE agreed to

---

[3] Although the Sale Agreement was an attachment to the Trustee's subsequently filed motion for approval of the sale, the Sale Agreement does not appear to have been included in the record on

purchase "all right, title and interest" in "[a]ll intellectual property rights of the Debtor's estate whether scheduled or unscheduled, including but not limited to" four categories of intellectual property rights (the IP Assets): (a) "copyright interests and all patent licensing rights to the software, processes, methodologies, circuitry and designs used in all of the products jointly developed by Debtor and PIE pursuant to their agreement, as amended, related to the products identified in Schedule 1"; (b) the two copyright infringement items listed in Fiori's schedule of personal property; (c) the seven patents and two patent applications listed in Fiori's schedule of personal property; and (d) three unscheduled copyrighted works authored by Fiori. *See* R., Tab 12 at 3-4. The Sale Agreement also provided the Chapter 7 Trustee would seek the Bankruptcy Court's approval of the sale.

On May 7, 2012, the Chapter 7 Trustee filed the contemplated motion for an order approving the sale and sent notice of the motion to all interested parties, including Fiori, advising them of the May 25, 2012, deadline for filing objections to the motion and the June 6, 2012, hearing thereon. On May 24, 2012, Fiori filed a written objection to the motion, alleging (1) he believed he had an agreement with the Trustee concerning the disposition of the assets to which the motion pertained; (2) PIE's release of its claim against the bankruptcy estate had no value to the estate, since PIE had already released its claims in its settlement of the adversary action; and (3) to the extent his prior agreement with the Trustee was not enforced, he intended to make a higher bid for the assets.[4] The objection did not disclose the amount Fiori was willing to bid.

---

appeal. Consequently, this Court has reviewed the Sale Agreement via the electronic docket in the bankruptcy case.

[4] Fiori also noted he had paid a $1,400 fee to keep one of his patents alive and asserted this amount would have to be repaid out of the estate as an administrative expense.

The Bankruptcy Court held a hearing on the Trustee's motion on June 6, 2012, at which the Trustee, Fiori, and PIE all appeared by counsel.[5]  During the course of the hearing, the Trustee described how the Sale Agreement had evolved:  Following the 341 meeting, at which Fiori testified his scheduled intellectual property had no value, the Trustee received no expressions of interest in any of the intellectual property until PIE's counsel contacted her about acquiring the IP Assets.  PIE initially proposed to acquire the Assets for a lesser amount on the theory that since Fiori had said the Assets were worth nothing, the Trustee would likely end up abandoning them.  Hr'g Tr. 46, June 6, 2012.  The Trustee rejected PIE's initial offer and negotiated the Sale Agreement in an effort to secure a higher payment for the benefit of the estate.  *Id.* at 46-47; *see also id.* at 103.

While negotiating with PIE regarding the IP Assets, the Trustee was also negotiating with Fiori regarding the purchase of certain other property of the estate, including real estate and a vehicle.  *See id.* at 75.  At some point, Fiori offered to purchase all of the assets of the estate for $60,000.  *See id.* at 88, 107-08.  After learning of the Trustee's negotiations with PIE, Fiori proposed to include the IP Assets (or some of them) in this offer; however, according to the Trustee, Fiori expected to receive the intellectual property as a "throw-in" for no additional consideration.  *See id.*; *see also* Hr'g Tr. 45, 93, June 29, 2013.

At the outset of the hearing, the Bankruptcy Court addressed a dispute between Fiori and PIE as to whether Fiori retained the right to bid on the IP Assets under the terms of the Settlement Agreement in the adversary action.  PIE argued Fiori was precluded from bidding on the Assets because, in the Settlement Agreement, he had assigned all of his intellectual property

---

[5] The Trustee herself was not present at the hearing due to a scheduling conflict; therefore, the Trustee's counsel articulated the Trustee's position on the various issues before the Bankruptcy Court.  Although Fiori was present at the hearing, he did not testify, and, except as noted, his arguments were also articulated by counsel.

rights to PIE without limitation and agreed to cooperate in PIE's efforts to obtain the Bankruptcy Court's approval of the acquisition. PIE contended that bidding against PIE for the IP Assets would run afoul of Fiori's obligation to help the company acquire the Assets. Fiori disputed PIE's interpretation, maintaining he had assigned to PIE only a subset of his intellectual property rights in the Settlement Agreement—namely, his rights in the products he jointly developed with PIE—and was therefore obligated to cooperate in PIE's efforts to acquire only those assets.[6] The Trustee took no position on the proper interpretation of the Settlement Agreement, but stated if Fiori were permitted to bid against the PIE offer, she would encourage the bid, noting her fiduciary obligation to accept higher and better offers. Hr'g Tr. 6, June 6, 2012. After independently reviewing both the Settlement Agreement and the transcript of the July 19, 2011, hearing in the adversary action at which PIE orally summarized the terms of the parties' then-undocumented agreement, the Bankruptcy Court found the Settlement Agreement unambiguously assigned *all* of Fiori's intellectual property rights to PIE and the cooperation provision thus precluded Fiori from bidding. *See id.* at 58-62. Although both Fiori and PIE had witnesses available to testify regarding the meaning of the Settlement Agreement, the Court found it unnecessary to hear from these witnesses in light of its conclusion the Agreement was unambiguous.

The hearing continued, and as the Trustee was preparing to make an offer of proof in support of the motion to approve the sale, Fiori's counsel represented for the first time that Fiori's wife, who was also present at the hearing but had not previously objected to the sale, was prepared to bid on the Assets. *Id.* at 76. Counsel did not disclose the amount Mrs. Fiori was

---

[6] Fiori took the position the Settlement Agreement covered only the first of the four categories of intellectual property assets described in the Sale Agreement, i.e., the property described in subparagraph (a). Fiori maintained he had not assigned his rights to the intellectual property assets described in subparagraphs (b), (c), and (d).

prepared to bid, representing only that Mrs. Fiori could be qualified as a bidder in her own right. The Bankruptcy Court ultimately declined to permit Mrs. Fiori to bid, since her doing so would effectively circumvent the Court's ruling. *Id.* at 82. The Court also suggested it could not permit Mrs. Fiori to bid on the Assets without opening the bid to everyone, and Mrs. Fiori would therefore need to demonstrate her bid would be high enough to offset the cost the estate would incur in holding an auction. *Id.* at 81-82. Although Fiori's counsel represented he believed "there may be a sufficient bid" by Mrs. Fiori, counsel again did not specify the amount of such bid. *Id.* at 83.

After hearing further argument from the parties, the Bankruptcy Court overruled Fiori's objections to the sale, finding there was no evidence of any actual agreement between Fiori and the Trustee regarding any of the IP Assets,[7] and the Settlement Agreement's cooperation provision precluded Fiori from bidding on the IP Assets or otherwise opposing the sale. *See id.* at 90-92.

Toward the conclusion of the hearing, the Trustee's counsel put forth an offer of proof that, if called as a witness, the Trustee would have testified (1) she entered into an agreement with PIE for the sale of certain intellectual property for $7,500 and a waiver of PIE's proof of claim in the amount of $618,451.49; (2) the sale was fairly negotiated in an arm's length transaction, and PIE was a good faith purchaser; (3) she has no financial, family, business, or other connection or relationship with PIE; (4) in determining whether the sale price was fair, she considered Fiori's testimony at the 341 meeting that the intellectual property had no value as well as PIE's position that Fiori's failure to cooperate with the sale would constitute a breach of

---

[7] Although Fiori's counsel represented Fiori had made an offer to purchase all of the assets of the estate, including Fiori's intellectual property, for a payment "in the neighborhood of $60,000," Hr'g Tr. 88, 107, June 6, 2012, he conceded no agreement of sale was ever signed or executed, *id.* at 90.

the Settlement Agreement and would arguably cause PIE's proof of claim to spring back; and (5) she believed in her business judgment that PIE made the highest and best offer for the assets and the sale was in the best interest of the estate and its creditors. *Id.* at 94-95.

Following the proffer, the Bankruptcy Court approved the Sale Agreement. Addressing Fiori's objections regarding the Trustee's failure to attempt to ascertain the value of the IP Assets beyond relying on Fiori's own testimony and PIE's representations, such as by marketing the assets, the Court found there was no basis to require the Trustee to incur the expense of an auction because there was no evidence there was any independent party who was interested in bidding.[8] The Court also found an auction would not be warranted, even if the Fioris were permitted to bid, because there was no reason to believe the IP Assets were worth more than the $7,500 PIE had agreed to pay, as Fiori himself had indicated his intellectual property had no value or unknown value. Although Fiori's counsel represented Fiori had since learned, in April 2012, that one of his patents had "some value," *id.* at 106-07, Fiori himself could not quantify the patent's value, describing it as "speculative," *id.* at 109.[9] Thus, in the absence of any evidence that a third party would pay more than $7,500 for the IP Assets, the Court found the $7,500 purchase price was reasonable, and found no basis to conclude it would be in the best interest of the estate to incur the expense of an auction. At the conclusion of the hearing, the Bankruptcy Court signed the Sale Order, which granted the Trustee's motion and authorized the Trustee to sell Fiori's interest in the IP Assets "free and clear of all liens, claims and encumbrances" pursuant to 11 U.S.C. § 363. R., Tab 2. The Sale Order memorialized the Bankruptcy Court's

---

[8] The Court also overruled Fiori's objection to the Trustee's failure to market the IP Assets based on his failure to raise it in his written submission. *Id.* at 92.

[9] After describing the value of the patent as speculative, Fiori stated he had "reason to believe it could be worth a million or more"; however, he conceded there was "nobody out there now" who would pay $1 million for the intellectual property. *Id.* at 109-10.

findings that the sale was "in the best interest of [Fiori's] estate, all creditors and parties in interest" and was "a purchase in good faith for fair value within the meaning of 11 U.S.C. § 363(m)." *Id.*

The following day, on June 7, 2012, Fiori filed a motion for a stay pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8005 and requested an expedited hearing on the motion, which the Bankruptcy Court granted.[10]   At the June 13 hearing, Fiori testified regarding his understanding of the Settlement Agreement and disclosed, in response to his counsel's questioning, that his wife had assets in her own name and had been prepared to bid "in the neighborhood of $100,000" had there been an auction for Fiori's patents.   Hr'g Tr. 21-22, June 13, 2012.   Upon hearing of the $100,000 figure, which had not previously been disclosed either at the June 6 hearing or as part of Fiori's negotiations with the Trustee, the Trustee expressed interest in finding a mechanism to get the funds into the estate, notwithstanding the procedural posture of the case as an appeal.   Toward this end, the Trustee proposed that Fiori withdraw the appeal and instead seek reconsideration of the Sale Order based on the "new fact" of Mrs. Fiori's willingness to bid $100,000, suggesting Mrs. Fiori could be given some time to wire the $100,000 to the Trustee's account to show the offer was real.   *See id.* at 52-54, 61, 84. At the end of the hearing, the Bankruptcy Court denied the stay, but expressed willingness to reconsider the Sale Order if Fiori were to show there was a real offer for the IP Assets.   *See id.* at 84-86.

On June 14, 2012, Fiori withdrew his notice of appeal and filed a motion for reconsideration of the Sale Order, representing Mrs. Fiori was "prepared to bid up to the sum of

---

[10] At the time Fiori filed his stay motion, he had not yet filed a notice of appeal from the Sale Order.  Fiori eventually filed a notice of appeal on June 13, 2012, just before the hearing on the stay motion.

$100,000.00 for the Debtor's patents and copyrights which were in part the subject of the sale," and requesting the scheduling of an auction sale in the best interests of the estate. R., Tab 28. The Bankruptcy Court scheduled an expedited hearing on the motion for June 29, 2012, and extended the automatic 14-day stay through the hearing date. Prior to the hearing, the Trustee filed a statement in support of Fiori's motion for reconsideration, construing Mrs. Fiori to have made an offer to purchase the IP Assets for $100,000 at the hearing on the stay motion, and arguing the offer constituted "new evidence" suggesting the Assets should be marketed and offered at public auction. R., Tab 34. The Trustee represented that although at the time of the June 6 hearing, she reasonably believed the Assets had little value based on Fiori's testimony at the 341 meeting, Mrs. Fiori's offer suggested the Assets were worth significantly more than the $7,500 sale price and an auction was therefore warranted. The Trustee cautioned her support for the motion for reconsideration was contingent on Mrs. Fiori providing evidence of her ability to pay $100,000 and, without such evidence, the Trustee would oppose the motion. PIE opposed the motion.

At the June 29 hearing, Fiori argued reconsideration of the Sale Order was warranted based on two items of "newly developed information": (1) the fact Mrs. Fiori was ready, willing, and able to participate in a vigorous auction for her husband's intellectual property, and (2) Fiori's post-Sale Order receipt of a notice from the United States Patent and Trademark Office that a patent would issue from one of his patent applications. *See* Hr'g Tr. 7-12, June 29, 2012. Fiori asserted both of these factors affected the value of the assets. The Trustee also argued in support of the motion on the basis that Mrs. Fiori's willingness to pay $100,000 for the IP Assets constituted new evidence that was not available at the time of the sale hearing. The hearing thereafter proceeded on the assumption that, despite his earlier failure to assign any

value to his intellectual property, Fiori had come to believe the property was worth $100,000 and his wife was willing to bid this amount to acquire the property. Toward the end of the hearing, however, in response to the Bankruptcy Court's concerns about Fiori's failure to assign any value to his intellectual property earlier, Fiori's counsel clarified the value of the intellectual property still remained unknown or speculative and Mrs. Fiori was not committing to bid $100,000 but "up to" $100,000 in the event an auction was held. *See id.* at 100-01. Based on these clarifications, the Trustee withdrew her support for the reconsideration motion, which had been predicated on Mrs. Fiori's willingness to bid $100,000, noting the "up to" qualification made the bid meaningless, where PIE had indicated it would not bid. The Bankruptcy Court orally denied the motion, finding there was no newly discovered evidence concerning the value of the IP Assets or the actual amount of Mrs. Fiori's bid and there was thus still no basis to require the Trustee to incur the expense of an auction.

Later in the day on June 29, Fiori filed a second notice of appeal of the Sale Order "as may have been subsequently modified by Order of Court dated June 29, 2012." R., Tab 1. The same day, Fiori filed an emergency motion for stay pending appeal in this Court "to preserve [his] appellate rights . . . in connection with the items subject to the . . . sale." *See In re Fiori*, No. 12-mc-174 (E.D. Pa. filed June 29, 2012), ECF No. 1. After hearing from the parties via teleconference, by order of July 2, 2012, this Court denied a stay, finding "Fiori's likelihood of success on appeal and his risk of irreparable harm absent a stay weigh[ed] distinctly against granting his motion for an emergency stay." *In re Fiori*, No. 12-mc-174, Order (E.D. Pa. July 2, 2012), ECF No. 2.

On July 3, 2012, the Bankruptcy Court entered an order denying Fiori's motion for reconsideration and directing the Chapter 7 Trustee to close with PIE on the Sale Agreement

within two business days.  On July 9, 2012, PIE and the Trustee closed on the Sale Agreement. The parties have since advised the Court that in February 2013, PIE sold and assigned the IP Assets to Summers Patent Holdings, LLC (SPH), for the same $7,500 price PIE paid to acquire the Assets from the estate.  SPH, in turn, has licensed the IP Assets to Aamp of Florida, Inc. (AAMP), for $1,000 in connection with AAMP's acquisition of some, but not all, of PIE's assets.

## DISCUSSION

The gravamen of Fiori's appeal is a challenge to the Bankruptcy Court's interpretation of the assignment of Fiori's intellectual property rights in the Settlement Agreement.  Fiori argues the Bankruptcy Court erroneously interpreted the Settlement Agreement to reflect Fiori's assignment to PIE of all of his intellectual property rights, without limitation, when in fact Fiori agreed to assign only his intellectual property rights to the products he jointly developed with PIE.  Fiori asserts this contract interpretation error tainted the sale process, causing the Bankruptcy Court to improperly preclude Fiori from bidding on the IP Assets and to approve the sale of the Assets to PIE for an amount less than what Fiori was willing to pay.  Fiori thus contends the Bankruptcy Court erred in finding PIE purchased the IP Assets in good faith.  He asks this Court to reverse the Sale Order and remand the case to the Bankruptcy Court for further proceedings.  In addition to opposing Fiori's appeal on the merits, PIE argues Fiori lacks standing and asks the Court to dismiss the appeal on statutory mootness grounds pursuant to 11 U.S.C. § 363(m).

As standing is a threshold issue, the Court first addresses PIE's argument that Fiori lacked standing to object to the sale—and lacks standing to pursue this appeal—because he has not shown the sale affected his pecuniary interests.  Standing in a bankruptcy appeal is narrower

than Article III standing, and is generally limited to persons whose pecuniary interests are directly and adversely affected by the challenged order. *Spenlinhauer v. O'Donnell*, 261 F.3d 113, 117-18 (1st Cir. 2001). Because a Chapter 7 debtor is divested "of all rights, title and interest in nonexempt property of the estate at the commencement of the case," the debtor "typically lacks any pecuniary interest in the chapter 7 trustee's disposition of that property." *Id.* at 118. To establish standing, the debtor "must adduce sufficient evidence to demonstrate that the challenged order directly and adversely affect[ed] [his] pecuniary interests," such as by showing "nullification of the sale is likely to result in an overall surplus in the chapter 7 estate." *Id.* at 119.

The parties' arguments as to whether Fiori has satisfied his burden to show reversal of the Sale Order would create a reasonable possibility of a surplus in the estate center on whether PIE's $614,276.50 claim must be considered. Fiori argues PIE's claim need not be taken into account because the claim was extinguished as a result of the Settlement Agreement. PIE maintains the claim must be considered because if Fiori (or his wife) were to bid on the IP Assets at an auction, Fiori would be in breach of his obligations under the Settlement Agreement, entitling PIE to revoke the settlement and reinstate the adversary action and its bankruptcy claim. The Settlement Agreement requires Fiori to "cooperate to the extent requested by PIE" to obtain the Bankruptcy Court's approval of PIE's acquisition of Fiori's intellectual property from the estate. R., Ex. 46. Although the Settlement Agreement goes on to state "the failure to obtain such Bankruptcy Court Approval shall not in any way effect the validity of the release set forth in paragraph 2 above or the dismissal of the Adversarial Litigation contemplated herein," this statement is predicated on Fiori's obligation to cooperate. *Id.* The Settlement Agreement does not specifically address what happens in the event of a breach of Fiori's cooperation obligation.

At the hearing on Fiori's motion for reconsideration of the Sale Order, where the issue of Fiori's standing was first raised, the Bankruptcy Court agreed if the Fioris were permitted to bid on the IP Assets, PIE's claim would likely spring back. *See* Hr'g Tr. 38-41, June 29, 2012. Thus, because Fiori has made no argument that a surplus in the estate would be likely even if PIE's claim is taken into account, the Court is inclined to agree Fiori has not satisfied his burden to show the Sale Order affected his pecuniary interests.

Nevertheless, Fiori may have standing as an unsuccessful bidder insofar as he challenges the Bankruptcy Court's finding that PIE purchased the IP Assets in good faith. Although, as a general rule, a disappointed bidder does not have standing to challenge a bankruptcy court's approval of a sale, this rule is not absolute. *In re Colony Hill Assocs.*, 111 F.3d 269, 273 (2d Cir. 1997). Rather, the rule is subject to an exception where the bidder "attacks [the] bankruptcy sale on equitable grounds related to the intrinsic structure of the sale." *Id.* at 274 (quoting *In re Harwald Co.*, 497 F.2d 443, 444-45 (7th Cir. 1974)); *see also id.* (holding an unsuccessful bidder had standing to challenge the bankruptcy court's approval of a sale to the extent the bidder "allege[d] that [the purchaser's] actions destroyed the 'intrinsic fairness' of the sale transaction so that it was not a good faith purchaser"). Because Fiori's appeal appears to fall into this exception, the Court will proceed to address PIE's argument that the appeal should be dismissed as statutorily moot pursuant to 11 U.S.C. § 363(m).

Intended to "promote certainty and finality in bankruptcy sales, § 363(m) prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate property if a party failed to obtain a stay of the sale." *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001). The statute provides:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale . . . of property does not affect the validity of a sale

. . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).[11]   In construing § 363(m), the Third Circuit has rejected a per se rule whereby this provision automatically "moot[s] every appeal not accompanied by a stay," instead interpreting the provision to "restrict the results of a reversal or modification of a bankruptcy court's order authorizing a sale . . . , if reversal or modification would affect the validity of the sale." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998). The Third Circuit has thus identified "two prerequisites for section 363(m) 'statutory' mootness: (1) the underlying sale . . . was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell . . . , would be affecting the validity of such a sale." *Id.*

Because § 363(m) limits the effect of an appellate reversal of a sale authorization only when the buyer purchased the property in good faith, this Court must first consider Fiori's challenge to the Bankruptcy Court's finding that PIE was a good faith purchaser.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 (3d Cir. 1986) (suggesting an appellant who does not obtain a stay pending appeal faces dismissal of his appeal for mootness pursuant to § 363(m) "should the district court affirm the bankruptcy court's finding of good faith"); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) ("[W]here the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before

---

[11] By its terms, § 363(m) applies to an authorization of the sale of property under § 363(b), which, subject to certain exceptions not applicable here, permits a trustee, after notice and a hearing, to sell property of the debtor's estate.  11 U.S.C. § 363(b)(1).  Property of a bankruptcy estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), including "causes of action that belong to the debtor, as well as the debtor's intellectual property, such as interests in patents, trademarks and copyrights," *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991); *see also Kunkel v. Jasin*, 420 F. App'x 198, 200 (3d Cir. 2011) (holding a bankruptcy estate "can encompass the debtor's intellectual property").

dismissing any subsequent appeal as moot under section 363(m).").  PIE's status as a good faith purchaser is a mixed question of fact and law; hence, this Court "exercise[s] plenary review of the legal standard applied by the . . . bankruptcy court[], but review[s] the [bankruptcy] court's findings of fact on a clearly erroneous standard." *Abbotts Dairies*, 788 F.2d at 147.  "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Because neither the Bankruptcy Code nor the Bankruptcy Rules defines the term "good faith," courts applying § 363(m) have "turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbott Dairies*, 788 F.3d at 147.  As the Third Circuit has observed:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) ("[T]he good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale.").

Fiori argues PIE acted in bad faith by negotiating in secret with the Trustee to acquire the IP Assets, seeking to acquire intellectual property rights beyond those assigned based on an overreaching interpretation of the Settlement Agreement, and advancing the same overreaching

interpretation of the Settlement Agreement in the Bankruptcy Court to preclude Fiori and his wife from bidding on the IP Assets, thereby depressing the Assets' sale price.

Although Fiori accuses PIE of negotiating with the Trustee in secret, he does not argue the Sale Agreement was the product of collusion or otherwise dispute the Trustee's representation that the Sale Agreement was fairly negotiated in an arm's length transaction. Nor would the record support such an argument. Not only did the Trustee engage in protracted negotiations to obtain the $7,500 purchase price, but she also affirmatively urged the Bankruptcy Court to vacate the Sale Order and conduct an auction when it appeared Mrs. Fiori was prepared to bid $100,000 for the Assets. Fiori's argument regarding PIE's secret negotiations with the Trustee is a nonstarter. While Fiori may not have been privy to the actual negotiations between PIE and the Trustee, he knew, at least as early as July 19, 2011, when the parties appeared in the Bankruptcy Court and announced the adversary action had been settled, that PIE was negotiating with the Trustee to acquire some of his patents. R., Tab 48 at 6. Regardless, Fiori plainly received notice of the precise terms of the Sale Agreement in advance of the June 6 hearing on the sale motion, and had ample opportunity to object to the sale, which he did.

The Court is also not persuaded that PIE's advocacy of its interpretation of the Settlement Agreement to preclude the Fioris from bidding on the IP Assets amounts to the kind of "misconduct that would destroy [PIE's] good faith status." *Abbott Dairies*, 788 F.3d at 147 (citation and internal quotation marks omitted). As Fiori acknowledged at oral argument, for purposes of evaluating PIE's good faith, the question is not simply whether PIE's legal position was incorrect, but whether the legal position was so untenable that PIE could not have advanced it in good faith. *See In re Gucci*, 126 F.3d at 392-93 (rejecting assertion that purchaser acted in bad faith by conditioning its offer on the inclusion of property in the bankruptcy estate which

purchaser allegedly knew properly belonged to a third party, where purchaser had at least a colorable claim that the property was owned by the estate). The fact that the Bankruptcy Court readily agreed with PIE's interpretation suggests PIE had at least a colorable basis to assert it. Moreover, although Fiori now argues the Settlement Agreement's meaning is so clear that PIE's interpretation amounts to bad faith, in the Bankruptcy Court, his counsel acknowledged "reasonable minds can disagree as to how clear and unambiguous that agreement is." Hr'g Tr. 44, June 13, 2012; *see also* Hr'g Tr. 64-65, June 6, 2012 (describing ambiguity in the Settlement Agreement). Thus, even assuming PIE's interpretation of the Settlement Agreement's assignment provision is incorrect—and it is not clear it is—the Court cannot conclude PIE's advocacy of its interpretation was in bad faith.[12]

---

[12] The Settlement Agreement is not a model of clarity. The parties' dispute centers around the Agreement's assignment provision, in which Fiori agreed to "assign[], transfer[], quitclaim[], and convey[] to PIE all of Fiori's intellectual property rights, if any, including but not limited to all copyright interests and all patent licensing rights, to the software, processes, methodologies, circuitry and designs used in all of the products joint developed pursuant to the agreement and its amendments." R., Tab 46. The Bankruptcy Court was persuaded by PIE's argument that the phrase "*all* of Fiori's intellectual property rights," followed by the phrase "including but not limited to," meant Fiori was conveying all of his intellectual property rights without limitation, and that the language following the phrase "including but not limited to" exemplified but did not limit the intellectual property rights being conveyed. Given the parties' litigation history, including Fiori's past allegations of patent infringement, it is entirely plausible PIE could have sought to acquire all of Fiori's intellectual property rights to ensure it would have no further litigation with Fiori going forward, as Fiori himself acknowledged his intellectual property was at least related to PIE's products. Hr'g Tr. 19-20, 33, June 13, 2012. As Fiori notes, however, PIE's interpretation fails to give effect to the fact that the phrase "including but not limited to all copyright interests and all patent licensing rights" is set off from the rest of the sentence by commas and is thus most naturally read as a nonrestrictive clause modifying the term "intellectual property rights." Under this reading, the provision reflects Fiori's agreement to assign a potentially narrower set of intellectual property rights—namely, all of his intellectual property rights, if any, to the software, processes, methodologies, circuitry and designs used in all of the jointly developed products. PIE's interpretation effectively reads the comma following "patent licensing rights" out of the provision, such that the provision reflects Fiori's assignment of all of his intellectual property rights, including but not limited to all copyright interests and all patent licensing rights to the software, processes, etc. used in the jointly developed products.

Fiori argues PIE's interpretation of the Settlement Agreement is in bad faith because it differs from the description PIE provided when it advised the Bankruptcy Court the adversary action had been settled on July 19, 2011. Fiori points to language in counsel's brief description that suggests the settlement concerned "joint intellectual property" and PIE's negotiations to acquire Fiori's patents from the estate were a separate issue. R., Tab 48 at 5-6. Earlier in the same proceeding, however, counsel characterized the settlement as involving Fiori's transfer of "whatever intellectual property rights he has." *Id.* at 4. In any event, counsel made the brief oral remarks on which Fiori relies on July 19, weeks before the written Settlement Agreement was finalized and executed by the parties on August 9, 2011. *See* R., Tab 46. There is no indication counsel intended his description to memorialize the terms of the settlement; to the contrary, counsel appears to have provided the description primarily for the purpose of seeking the Bankruptcy Court's guidance on how to proceed in light of the fact that PIE was continuing to negotiate with the Chapter 7 Trustee to resolve its claim in the bankruptcy. In these circumstances, counsel's oral summary falls short of showing bad faith.

---

The interpretation Fiori advocates is also in some tension with the language of the assignment provision. Fiori argues the provision should be read as assigning "all intellectual property rights, if any, used in all of the products jointly developed pursuant to the agreement and its amendments," and should not be interpreted as assigning any of Fiori's patents. Appellant's Reply 11-12. However, this interpretation ignores that the provision purports to assign all of Fiori's intellectual property rights not just in the jointly developed products but to "the software, processes, methodologies, circuitry and designs used" in such products. Even if the reference to the jointly developed products is understood as limiting the scope of the assignment, the assignment can still plausibly be understood to include Fiori's patents, at least insofar as the patents claim "software, processes, methodologies, circuitry and designs" used in the jointly developed products. At a minimum, the Settlement Agreement is ambiguous as to whether it encompasses patents (or copyrights) to such "software, processes, methodologies, circuitry and designs." Notably, Fiori testified at the hearing on the motion to stay pending appeal that most of the products he made for PIE included circuits that were subject to some of his patents (which have since expired). Hr'g Tr. 12-13, June 13, 2012. Yet Fiori also took (and continues to take) the position his patents are not covered by the Settlement Agreement.

Finally, in addition to finding the Settlement Agreement precluded the Fioris from bidding on the IP Assets, the Bankruptcy Court also found no basis to permit the Fioris to bid for the independent reason that there was no evidence the Assets were worth more than the $7,500 PIE agreed to pay, suggesting PIE's legal position did not ultimately depress the sale price. For all of these reasons, the Court concludes the Bankruptcy Court did not err in finding PIE acted in good faith with respect to the sale of the IP Assets.

The Court also concludes the Bankruptcy Court did not err in finding PIE purchased the IP Assets for value. "Traditionally, courts have held that '[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets.'" *Abbotts Dairies*, 788 F.2d at 149 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1197 n.1). An auction may also be sufficient to establish the purchaser paid value. *Id.* Here, of course, there was neither an appraisal nor an auction of the IP Assets. Rather, as noted, the Bankruptcy Court specifically found there was no basis to require the Trustee to incur the expense associated with such efforts because there was no evidence the Assets were worth more than the $7,500 PIE agreed to pay. The Bankruptcy Court made this finding based on (1) Fiori's testimony at the 341 meeting and schedule of personal property, which characterized his intellectual property as having no or unknown value, (2) his later negotiations with the Trustee, wherein he sought to acquire the IP Assets as a "throw-in" for no additional consideration and without attributing any separate value to the Assets, (3) his statement at the June 6 hearing that the value of even the one patent his attorney characterized as having "some value" was "speculative," and (4) the fact that although both Fiori and his wife expressed interest in bidding on the Assets, neither had given any indication how much he or she was willing to bid. The Bankruptcy Court also considered PIE's release of PIE's $618,451.49 proof of claim and PIE's position that if Fiori were to breach

the Settlement Agreement, it could revive the claim. These facts amply demonstrate the Bankruptcy Court did not clearly err in finding the $7,500 purchase price was reasonable and the purchase was for fair value.

Fiori does not dispute the estate obtained value for the sale through PIE's payment of $7,500. He instead argues the Bankruptcy Court erred in finding PIE paid fair value when the estate "could potentially have had an additional $92,500 for the same items." Appellant's Reply 16. Although Mrs. Fiori was present at the June 6 hearing on the sale motion, the information regarding her willingness to bid up to $100,000 for her husband's intellectual property did not come to light until after the Bankruptcy Court had approved the sale. The Bankruptcy Court considered this information at the hearing on Fiori's motion for reconsideration and concluded reconsideration was not warranted either based on new evidence or to prevent a manifest injustice. In particular, the Bankruptcy Court found Mrs. Fiori's willingness to bid "up to" $100,000 did not constitute new evidence of the value of the IP Assets because there as still no indication how much she would actually bid, and, where PIE represented it could not bid, there was no evidence Mrs. Fiori's bid would be high enough to offset the cost of an auction. *Cf. Bank of Am., N.A. v. Estate of Hood*, 47 A.3d 1208, 1213 (Pa. Super. Ct. 2012) (holding prospective purchaser's testimony he would have paid "up to" $580,000 for property had he been at the sheriff's sale was insufficient to establish the sheriff's sale price would have risen anywhere near $580,000 because there was no way to know how long other parties would have remained in the bidding). Fiori has not shown the Bankruptcy Court abused its discretion in so holding.

Because the Bankruptcy Court did not err in finding PIE purchased the IP assets in good faith, and because both the Bankruptcy Court and this Court declined to stay the Sale Order pending appeal, Fiori's appeal must be dismissed unless reversing the Sale Order would not

affect the validity of the sale. Although Fiori maintains a remedy can be had in this case, he provides no explanation as to how the remedies he seeks would not affect the validity of the sale of the IP Assets, which closed on July 9, 2012, six days after the bankruptcy court denied reconsideration. *See Krebs*, 141 F.3d at 499 (holding in determining whether a remedy can be fashioned that will not affect the validity of the sale, a court "must look to the remedies requested by the appellants"). To the contrary, Fiori affirmatively asks this Court to "reverse the Bankruptcy Court's interpretation of the Settlement Agreement as plain error with the consequence of reversing the Order approving the sale of the IP assets" or, alternatively, to "reverse the Sale order based on the incorrect interpretation of the agreement, or other defects proffered herein, and remand the matter to Bankruptcy Court for proceedings consistent with that ruling." Appellant's Mem. of Law Appealing Bankr. Ct. Order 14-15; *see also* Appellant's Mem. in Opp'n to Appellee's Mot. to Dismiss 6-7 (arguing a remedy can be crafted in this case because "[t]he Trustee can be ordered to retain the paltry sum PIE paid and in the event of a successful appeal, the IP assets which were NOT jointly developed and NOT listed in the appendix of the settlement agreement could be returned to their rightful owner—[the estate]").

Because Fiori's requested remedies expressly seek to undo the sale (or some portion of it), however, the remedies would necessarily affect the sale's validity. *See In re Ala. Aircraft Indus., Inc.*, 514 F. App'x 193, 195 (3d Cir. 2013) ("A challenge to an authorized transaction will necessarily impact that transaction's validity if it seeks to affect the validity of a central element, such as the sale price." (citation and internal quotation marks omitted)); *Krebs*, 141 F.3d at 499 (holding reversal of an order allowing debtor to reject a buy-sell agreement, which resulted in the sale at auction of the franchise to which the buy-sell agreement pertained, "would have an impact on the validity of the auction sale of the . . . franchise, because reversing the

rejection would necessarily require reversing the subsequent assumption and assignment of the underlying franchises"); *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 650 (3d Cir. 1997) (holding an appeal from a bankruptcy court order authorizing the sale of assets from the debtor's Chapter 11 estate would affect the validity of the sale where the sale had already been consummated and the debtor sought on appeal to demonstrate the sale was flawed and the sale price was inadequate).[13]   Accordingly, the appeal is statutorily moot, and PIE's motion to dismiss will be granted.

---

[13] Whether a remedy can be crafted that would not affect the validity of the sale is distinct from the question whether a remedy can be crafted at all.  The former question goes to whether an appeal will be deemed statutorily moot under § 363(m); the latter question relates to the broader question of constitutional mootness.  *See Abbotts Dairies*, 788 F.2d at 150 & n.6 (distinguishing mootness under § 363(m) from Article III mootness, which requires dismissal "when an event occurs that prevents the appellate court from granting any effective relief, even if the dispute is decided in favor of the appellant").  Only statutory mootness is at issue in this case, as PIE has not even argued the closing of the sale of the IP Assets precludes this Court from granting Fiori any relief, much less satisfied its burden to show "the outcome of this appeal could not affect the legal interests of the parties."  *Id.* at 150-51 (internal quotation marks and citation omitted).  Nevertheless, Fiori focuses solely on constitutional mootness, arguing a remedy can be had here, without regard to whether his proposed remedies would affect the validity of the consummated sale.

   *In re Edwards*, 228 B.R. 573 (Bankr. E.D. Pa. 1999), on which Fiori relies to argue a remedy can be crafted, is inapposite on the question whether it is possible to craft a remedy that would not affect the validity of the sale.  *Edwards* is a bankruptcy court decision on a debtor's motion to stay a sale order pending an appeal in which the debtor challenged the bankruptcy court's findings regarding the adequacy of the sale price and the buyer's good faith.  In addressing the likelihood of irreparable harm to the debtor absent a stay, the bankruptcy court observed the debtor could appeal the court's finding of good faith even without a stay so long as the appeal was not otherwise moot in that no effective relief could be granted.  *Id.* at 579.  The court also found it would be possible to return the parties to the status quo if the sale were overturned on appeal, since the court could order the trustee to withhold distribution of the sale proceeds pending appeal.  *Id.* at 579-80.  The court did not address, however, whether this remedy would affect the validity of the sale, which had not closed at the time the stay motion was decided.  Moreover, in holding it would be possible to grant effective relief if the sale were overturned on appeal, the court noted the appeal was not about the ownership of property at issue (i.e., certain stock and partnership interests) but about the price of ownership, and observed the case was thus "markedly different than a sale of assets which cannot be unscrambled upon reversal of the sale."  *Id.* at 580 n.18.  *Edwards* is thus readily distinguishable from the facts of this case.

An appropriate order follows.

BY THE COURT:

   /s/ Juan R. Sánchez
Juan R. Sánchez, J.